

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JONATHAN K. BANKS,

      Plaintiff,

    v.

JAMES OWENS, BADGE #0701
(MEGHAN BACHMAN,
KENNETH  D. KLEINMAN,
RICHARD D. RABENA,
FRANKLIN INSTITUTE),
ADA ALLISON BORGATTI,
ADA ERIN O'BRIEN, AND
ADA ERIKA WEVODAU

      Defendants.

Civil Action No.:   **17   5423**

Plaintiff's Complainant

**JURY TRIAL DEMANDED**

# COMPLAINT

AND NOW, comes Plaintiff Jonathan K. Banks, IN PRO SE, and files the following Complaint, averring:

## I.  INTRODUCTION

1.  Plaintiff Jonathan Banks brings this action to seek relief for violations of his constitutional rights and statutory protections when defendants conspired and prosecuted him without probable cause.  Plaintiff was subject to malicious prosecution and a pendant state law claim for civil conspiracy.  Plaintiff brings this action pursuant to 42 U.S.C. sections 1983, 1985(3), 1988 for relief through compensatory  and punitive damages, stemming from Defendants' violations of Plaintiff's rights.

2.  As described herein, Jonathan Banks  (Mr. Banks) was the victim of a malicious prosecution scheme Philadelphia Police Detective James Owens, (Det Owens) Philadelphia Assistant Prosecuting Attorneys Erin O' Brien (ADA O'Brien),  Allison Borgatti (ADA Borgatti), and Erika Wevodau (ADA  Wevodau).  In addition, the malicious scheme was also perpetrated by Kenneth D. Kleinman, advisory counsel for the Franklin Institute, Richard D. Rabena, VP of Operations and Capital Projects who in addition, supervises the building security.  The events that gave rise to the claims did not warrant police intervention.  This was an innocuous case of a gentleman (Mr. Banks) seeking the friendship of a lady, one Ms. Meghan Bachman (Ms. Bachman).  Unfortunately and unbeknownst to Mr. Banks, after he and Ms.Bachman had begun to lay the foundation to a cordial friendship, Ms. Bachman learned that Mr. Banks had a criminal past, and, instead of telling Mr. Banks, either herself or through someone else, that she wished no further contact, Ms. Bachman informed the administrative personnel of the Franklin Institute (Richard D. Rabena who, I beleive, contacted Kenneth Kleinman), of her revelation, and instituted a chain of events that ultimately and unjustly led to Mr. Banks being arrested, charged

with stalking and harassment, detained for 44 days in the Philadelphia County Jail, on a 500 thousand bond, and ultimately held to stand an unwarranted trial where Mr. Banks was found not guilty.

## II.  **JURISDICTION AND VENUE**

3.  This action is brought pursuant to 42 U.S.C. Sections 1983, 1985(3) and the Fourteenth Amendment of the United States Constitution.  This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. Section 1331 (federal question) and under 28 U.S.C. Section 1343(1)(2)(3)(4) (civil rights).  This Court has jurisdiction over Plaintiff's pendant state law claims under 28 U.S.C. Section 1367 (supplemental jurisdiction) as the claims form part of the same case or controversy under Article III of the United States Constitution.

4.  Plaintiff invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.  All of the events alleged herein occurred with the Commonwealth of Pennsylvania, and all of he parties are either residents or have gainful employment careers within the Commonwealth of Pennsylvania.

5.  Venue is proper as all claims set forth herein arose in the Eastern District of Pennsylvania and the Plaintiff is a resident of this District.  Venue is found pursuant to 28 U.S.C. Section 1391(b).

## III.  **PARTIES**

6.  Plaintiff Jonathan Banks (Mr. Banks, I) is an adult who resides in Philadelphia, Philadelphia County, Pennsylvania.

7.  Defendant James Owens, Badge #0701 ("Det Owens") is a Detective for the Philadelphia Police Department, Special Victims Unit, and is employed and/or resides in this District.  At all times relevant to this action, Owens acted under color of state law.

8. Defendant Ms. Meghan Bachman (Ms. Bachman) is an adult who is employed and/or resides in the District

9. Kenneth D. Kleinman (Kenneth Kleinman) is an adult who is employed and/or resides in the District, and is advisory counsel for the Franklin Institute, and is an attorney of the law firm Stevens & Lee PC, located at 1818 Market Street, Floor 29, Philadelphia. Pennsylvania, 19103, and is the "Cc" on a Cease and Desist letter sent to Mr. Banks' email by Ms. Bachman, and whom Mr. Banks talked with an hour or two before his arrest.

10. Richard D. Rabena (Richard Rabena) is an adult who is employed and/or resides in the District. Mr. Rabena is Vice President of Operations and Capital Projects of the Franklin Institute, and he also supervises the building security.

11. The Franklin Institute is a science museum and the center of science education and research in Philadelphia, and conducts business from 222 N. 20th Street, Philadelphia, Pennsylvania, 19103.

12. Erin O' Brien, is an adult who is employed and/or resides in this District and was employed by the Philadelphia District Attorney's Office in regards to this action, and is now employed by the Chester County, Pennsylvania District Attorney's Office.

13. Ericka Wevodau is an adult who is employed and/or resides in this District and is employed by the Philadelphia District Attorney's Office.

14. Allison Borgatti, is an adult who is employed and/or resides in this District and is employed by the Philadelphia District Attorney's Office.

## IV.   FACTS

15. Mr Banks (I) was employed by Philadelphia Trolley Works, a privately owned transportation company in Philadelphia. He began employment in September 2010, and his

employment terminated on October 19, 2015, when he was arrested and charged with stalking and harassment.

16.  Philadelphia Trolley Works has various transportation contracts with different companies throughout Philadelphia.

17.  One of those contracts was with the Philadelphian Condominium Complex at 2401 Pennsylvania Avenue which provides a shuttle bus service for the residents, family and guest of the residents, and patrons to the various businesses within the complex.

18. The shuttle bus service begins at 7am and concludes at 11pm Monday thru Friday, and from 8am until 11pm on Saturday excluding all major holidays.

19.  There are 2 driving shifts:  The am shift which operates from 7am until 230pm, Monday thru Friday, and 8 am until 300 pm on Saturday, and the pm shift which operates from 230 pm until 11 pm Monday thru Friday, and 3pm until 11pm on Saturday.  The am shift consists of fourteen thirty minute trips.  The pm shift consists of twelve trips (six thirty minute trips and six forty-five minute trips).

20.  During the am shift, all of the trips travel North and South on 20th Street.  On the pm shift eight trips travel North and South on 20th Street, and 4 trips travel South on 19th Street, and North on 22nd Street.  After the lunch break (7pm to 730pm Mon thru Thur; 630pm to 715pm Fri and Sat), on the pm shift, the route changes to service the Rittenhouse Square area and the Theater District.

21.  When the shuttle bus route travels South on 20th street, the bus makes a left on Market Street, a right on 15th Street, a left on South Penn Square to Macy's/Philadelphia District Attorneys Office, which is the turn around point, and then makes a left onto Commerce, a left on John F Kennedy Boulevard (JFK), a right on 20th Street, a left on the Benjamin Franklin Parkway (Parkway), a right on 22nd Street, a left on Pennsylvania Avenue, a right on 25th Street back to the complex loading platform.

22.  When the shuttle bus travels South on 19th Street (pm shift), it then makes a right on Walnut Street, a left on West Rittenhouse Square, a left on South Rittenhouse Square, a left on East Rittenhouse Square, right on Locust Street, a left on Broad Street, a right on Spruce Street, a right on 16th Street, a left on Walnut Street, a right on 22nd Street back to the building as described in point 21.

23.  Please note that there has been and are many times when the shuttle bus couldn't make the right turn onto 16th Street (due to construction projects or illegally parked cars), during the pm shift.  As a result, the bus continues West on Spruce Street unit either 18th, 20th, or 22nd Street when it is permissible to make the right turn.  As the pm driver, from 2010 until 2013, and during times when I would work the pm shift, as the am driver, I've had to detour on numerous occasions, and the detour option was often utilized, if not for the entire pm shift, at least 1 or 2 trips.

24.  Ms. Bachman is employed by the Franklin Institute which is located at 222 North 20th Street.

25.  I can not recall when I first started to notice Ms.Bachman, but when I noticed her on a reoccurring basis, it was during my 830 am trip into Center City.  I would be driving South on the Westside of 20th Street, and Ms.Bachman would be walking North on the Westside of 20th Street.  I would see her 2 to 3 times a week for approximately a year, give or take a month or so.  Most of the time I would see her as I was driving South on 20th street.  There were times when I would not see her walking on my way driving into Center City, and would see her walking on my way driving back to the complex driving North on 20th Street.  I noticed, when I arrived at the Parkway, stopped at the red light, I would see Ms. Bachman go into the Franklin Institute.  After seeing this on various occasions, coincidentally,  I surmised she must work there.  This is how I saw Ms.Bachman, and was able to relate to her my observations, when I introduced myself to her, on July 27, 2015, as to her style of dress, wearing an ankle brace for several weeks,

standing on the median at 20th and JFK, and other observations consistent with instances of

Ms. Bachman walking on 20th Street and with me driving on 20th street.

26. I did not tell Ms. Bachman that I saw her on Spruce Street. This is one of the material

flaws in her statement to Det Owens to try and establish a course of conduct, i.e. following. It's

my contention that Ms. Bachman was induced to commit perjury by ADA Wevodau since she is

the ADA that prosecuted the case, and whom Ms. Bachman discussed the do's and don't's with,

i.e. do not mention you contacted the police because you discovered Mr. Banks has to register

as a sex offender or anything mentioning Mr. Banks having to register as a sex offender. I also

believe that ADA Wevodau is guilty of misconduct pursuant to PRPC 8.4 (c), see also Office of

Disciplinary Counsel v Price, 732 A2d 599, 604 (1999), by misrepresenting the case to the

judge and not being permitted to present as evidence that I have to register as a sex offender,

which was the impetus that lead Ms. Bachman to contact the police - not the visits and the

emails. I also believe that ADA Weavodau is guilty of violating the Oath of Office, 42 PA CSA

Section 2522, which states: …, **that I will use no falsehood,** …" ; and I also believe ADA

Wevodau  and Det Owens are guilty of Official Oppression, 18 PA CSA  5301(1).  As to

violations of federal law, ADA Weavodau and Det Owens are guilty of violating Title 18 U.S.C.,

Section 242 - Deprivation of Rights Under Color of Law, and Title 18 U.S.C., Section 241 -

Conspiracy Against Rights which under Section 242, ADA Wevodau, Det Owens, Kenneth

Kleinman, and Richard Rabena are joined.  The conspiracy allegation is premised on the

complicit and tacit interactions and agreement between Ms. Bachman and Richard Rabena,

who in turn contacted Kenneth Kleinman, advisory counsel for the Franklin Institute, See

Elbeshbeshy v Franklin Institute, 618 F Supp 170 (ED PA 1985), who it is believed, but I can't

be certain, but it is plausible that Kenneth David Kleinman conferred with his son Jason Ross

Kleinman who is an ADA for the Philadelphia District Attorney, and, it is fair to say, who in turn

may have talked with ADA Erin O'Brien, who has since taken ADA duties with the Chester

County District Atorney's Office, who Det Owens conferred with, and approved the arrest, but ADA Erin O' Brien's function was advisory and not judicial. ADA Allison Borgatti allegedly reviewed and approved the warrant, but her participation concludes at that juncture. I may be over reaching, but I see a pattern, or what I believe is cronyism and nepotism. The Arraignment Court Magistrate who approved the warrant and criminal complaint is James O' Brien, who may be related to ADA Erin O'Brien. I may be incorrect, and it may be just a coincidence, but it is plausible and worthy of further investigation. As I will discuss during the malicious prosecution claim, the charges are not supported by the evidence. This is a case where public officials abused their authority through concerted efforts.

27. Had I saw Ms. Bachman on Spruce Street, seeing her on Spruce Street would have been of no consequence since the shuttle bus route travels on Spruce Street on a regular reoccurring basis Monday thru Saturday. It was the defendants contention that seeing Ms. Bachman on Spruce Street established that I was following her, but as I have stated, I never told Ms.Bachman I saw her on Spruce Street, and did not know she lived on Spruce Street until I read the Philadelphia Police Department Investigation Report - 75-49 (Investigation Report) **after my acquittal, and witnessed her testimony at trial.**

28. In July 2015, I planned a trip to see the Pittsburgh Steelers on their first day of training camp in Latrobe, Pennsylvania. The first day was on July 26, 2015. I requested, Saturday, July 25th and Monday, July 27th as vacation days. I drove to and from.

29. When I arrive back in Philadelphia on July 27th, before I went home, I decided I would try to meet Ms.Bachman. I thought the worst that could happen would be that she wouldn't be interested in my company and, would, at least, tell me if she did not wish for me to contact her, or wait outside for her again.

30. I parked my car on Race Street at 20th Street, and waited for approximately thirty minutes. I was on the Artria, the assisted living facility, side of 20th Street across from the

Franklin Institute which has a surveillance camera on the front right corner of the building. I was so nervous and was trying to decide if I had the confidence to introduce myself to Ms. Bachman. It was a very difficult decision. I had an extreme amount of uneasiness. I decided I would leave, and as I was proceeding to leave, I walked in front of my car, and before I could turn, from in front of my car, to open the driver's door, Ms. Bachman exited the building.

31. I didn't know what to do. I only had a few seconds to decide it if I could approach Ms. Bachman. It was an extremely difficult decision. I had admired Ms. Bachman for almost a year, and now was the time of reckoning. I told myself, this is what I desired, now man-up.

32. When Ms. Bachman crossed Race Street, I approached her, and introduced myself. I told her my name was Jonathan, and extended my hand to shake her hand. We shook hands. I then asked her what was her name, and she asked why. I then said to her just a moment, and pulled out my cell phone that I had set to the Franklin Institute's website. I then scrolled down to a photograph, I believed was Ms. Bachman, and asked her was that her. She said yes. I then asked her when did she cut her hair because the photograph of the person resembling her had long hair. Ms. Bachman told me she had cut her hair about two years ago.

33. In the investigation report her account of our first meeting on July 27, 2015, if the report is accurately transcribed, is dramatically incorrect. First, Ms. Bachman stated that she "walked out of the Franklin Institute….." (Page 2 of 6, Investigation Report). There isn't any mention of which exit.

In the affidavit of probable cause (Affidavit), the exit is specifically mentioned: "…. She further stated on 7/27/15 she was leaving the Franklin Institute business entrance when she observed an unknown black male waiting outside." (Page 2 Affidavit).

34. On Page 3 of the Affidavit, it is mentioned that: "On Tuesday 10/18 15 [which is the incorrect date] was exiting the Franklin Institute from a different entrance. She had changed her routines since encountering this male. **She stated he was now waiting outside the other**

**entrance.**" (Page 3 of Affidavit)(emphasis added).  The material flaw with this statement is that Det Owens stated on Page 2 of the Affidavit, "….  She further stated on 7/27/15 she was leaving the **Franklin Institute business entrance** when she observed an unknown black male waiting outside." (See paragraph 33) (emphasis added).

    35.  The third, and final, time I went to visit Ms. Bachman was on Tuesday, October 13, 2015, not "10/18 15" (Affidavit Page 3).  On that day, I had taken my granddaughter, Jasmine Banks, who was two years old at the time (2/8/14), with me, and we were waiting around the business entrance.  I put Jasmine down, and let her move gaily about along the sidewalk in front of the building.  When Ms. Bachman exited the building, she had her head down looking at her cell phone with her cell phone earbuds in her ears.  I called out to Jasmine that Meghan was coming (as if Jasmine really knew who she was, or what was going on).   When Ms. Bachman looked up, she saw me and immediately turned around.  At that point, I knew she knew about my past.  I was so afraid, at that point.  I had no idea what to expect.  I had just hoped that Ms. Bachman would not do anything that would cause me to lose my job.  I knew, from that point on, that I would never visit or gesture, from the shuttle bus,  to Ms. Bachman ever again.  I had no qualms with that revelation.  I just did not want any negative action directed against me from trying to become acquainted with Ms. Bachman.  I needed time to allow her to be comfortable with my presence.  I couldn't inform her of my past at such an early stage.  I wanted her to see what a great person I was.  I had very negative experiences with the criminal justice system in the past.  Being a victim of malicious prosecutions, and not understanding what was happening to me.  The crime that I was convicted of, in Michigan, was handled almost the same way as the process was administer against me here in Pennsylvania.  But in Michigan, I was convicted for a crime that I did not commit.  I would have eventually, apprised Ms. Bachman had I had the opportunity when the time was appropriate for that type of information.  When I was waiting for Ms. Bachman the first 2 times, I was on the Atria side of 20th Street, at Race Street, alone.  If I

wanted to see Ms. Bachman, all I knew was that I had to be on 20th Street, by the front side of the Franklin Institute, where the entrances/exits are. I did not concern myself with any particular entrance/exit, I just knew to be on 20th Street. On the third visit, I assumed Ms. Bachman would be leaving from the business entrance. I assumed this because when I observed Ms. Bachman on my return trips during my 830 am bus shuttle trip, I would notice, coincidentally, that she entered the Franklin Institute through the business entrance which, of course, is on 20th Street (see paragraph 25).

36. Ms. Bachman's statement in the Investigation Report states: "Then on Tuesday October 13th, he was waiting outside the Franklin Institute again. I had already started using a different entrance to exit the building. He was now waiting outside of that entrance so I took three steps, saw him and turned around." (Page 3 of 6, Investigation Report). This statement is consistent with her trial testimony: Q On October 13, 2015 were you still employed at the Franklin Institute?

> A Yes.

> Q And did you see the defendant again that day?

> A Yes.

> Q Were you outside the Franklin Institute or somewhere else?

> A I just walked outside.

> Q At that point had you used the same exit or a different exit that you saw
> the defendant at the first two occasions that he saw you outside of work?

> A I started using a different exit.

(TT, Page 30).

37. What's interesting about this statement is that it's alluding that I was watching her, and knew she would be leaving from a "different exit". I went to see Ms. Bachman on October 13, 2015, because I hadn't received a reply from her in regards to the emails I had sent. I was

curious as to why. I saw her on October 8, 2015, but that was only for a few seconds. I was able to call out to her in greeting because the light was red at 20th and JFK, but I couldn't converse or ask her anything because I had residents on the vehicle. She had just crossed JFK, walking North as I was approaching JFK driving South in the same manner as we had always been since I began noticing her, and after we became acquainted.

38. After I sent the first email, on September 29, 2015, Ms. Bachman, unbeknownst to me, googled my name and learned that I had to register as a sex offender. That is why Ms. Bachman contacted the police the first time. The defendants want to make it appear as if Ms. Bachman contacted the police the second time because I unexpectedly visited her three times and sent her five emails, and supposedly saw her on Spruce Street when I did not tell Ms. Bachman that I saw her on Spruce Street.

39. In the Investigation Report, Ms. Bachman relates the following:

"Q. When did you first become aware that he was a registered sex offender?

R. After he sent the first email because that had his last name in it. I called the police the first time right after that. They said there is not much they could do because he was an admirer and not a stalker…." (Page 3 of 6, Investigation Report).

40. Another material flaw in the Affidavit of Probable Cause has two components: First, it is mentioned that I am a registered sex offender: "She is fearful because he is a registered sex offender…" (Page 3 of 3, Affidavit of Probable Cause), second, that statement is inadmissible evidence, and should not have been included in the affidavit of probable cause. This contention is supported in two ways: First, it was not, and could not have been mentioned at the trial under Pennsylvania Rules of Evidence, Rules, 404(b), and second this information included in the affidavit supports the premise that the affidavit was not reviewed, or was reviewed and ADA Allison Borgatti, the ADA who allegedly reviewed and approved the affidavit of probable cause chose to inappropriately approve the affidavit of probable cause contrary to Pennsylvania Rule

of Criminal Procedure, Rule 507, when one of the reasons for disapproval of the affidavit of

probable cause, when they are submitted for approval, is **IS= Inadmissible Evidence**. Also,

more importantly, the evidence that I was a registered sex offender was not presented at trial

because the evidence was inadmissible character evidence under Rule 404(b). In knowing this,

the entire prosecution was a shame, a farce, a travesty, and a totally egregious

misrepresentation of what a judicial proceeding is purported to stand for.

    41. Det Owens omitted the material information about the shuttle bus and it's frequency

on 20th Street from the affidavit, and the fact that Ms. Bachman had contacted the police on

September 30, 2015, and was told here was nothing they could do because I was an admirer

and not a stalker.

    42. The public defender, Geoffrey Kilroy, failed to subject the Commonwealth's case to

meaningful adversarial testing. Geoffrey Kilroy, ask a couple of good questions on cross-

examination, but failed miserably when it mattered most as illustrated from the following excerpt

at the trial: Q So then on September 29 you start receiving e-mails; correct?

        A Yes.

        Q At no time on any of the e-mails did you ever reply stop sending them, you're

           making me uncomfortable; correct?

        A I was **instructed** not to.

        Q But, in fact, you did not.

(TT, Page 39).

Geoffrey Kilroy failed to ask Ms.Bachman (1) who instructed her not to and why;  (the why

would have ruined the Commonwealth's case and unequivocally served as the basis for

disciplinary and criminal proceedings against the defendants.  Geoffrey Kilroy had to know that

immediately, and chose to abandon that line of cross-examination.

43. Geoffrey Kilroy also failed to ascertain what street Ms Bachman exit to **each time** she departed from work, and how was that different when each time you departed from work and I was there waiting, the Street (20th Street) exited to was the same. The entrance/exit issue is irrelevant was a subterfuge to make it appear that I was watching her. As I stated previously, the first two times I waited for Ms. Bachman, I was on the Atria side of 20th Street by my car which was on the corner of Race Street at 20th.

44. I would also like to mention that I was not provided copies of the affidavit of probable cause and the complaint pursuant to the Pennsylvania Commonwealth Court Rules. Rule 540, Preliminary Arraignment, section (D), states: "If the defendant was arrested with a warrant, the issuing authority **shall** provide the defendant with copies of the warrant and supporting affidavit (s) at the preliminary arraignment, unless the warrant and affidavit (s) are not available at that time, in which event the defendant **shall** be given copies no later than the first business day after the preliminary arraignment." I was not provided copies at the preliminary arraignment, or "the first business day after...", nor during the 44 days I was detained in the Philadelphia County Jail. I was intentionally not provided with  copies of those documents. Had I been provided with copies of those documents, I would have been able to see what was being alleged, and I would have been able to request the surveillance video from the surrounding agencies: Moore College of Art, The Atria, The Franklin Institute, and the Philadelphia Free Library. Each one of those agencies has a surveillance camera that would have provided footage of 20th Street between Race and the Parkway, and the surrounding area, but not being provided with the documents effectively prevented any meaningful opportunity to establish a "rock solid" defense.

45. The Philadelphia Municipal Court Criminal Procedure Rules, Rule 558, states: "The Defender's Association **shall** not be required to give written notice [for discovery] in all cases represented by it." (emphasis added).  Cheryl Brooks was the first public defender assigned to my case.  When she came to visit me at the Philadelphia County Jail, a few days before the

original date of trial, October 29, 2015, she did not have any discovery, and did not ask me why I did not receive copies of the documents pursuant to the court rule. I was arrested on October 19, 2015. The trial was continued from October 29, 2015 until December 3, 2015 with a 500 thousand dollar bond which effectively thwarted all possible opportunities for a meaningful defense. Not being provided with copies of the documents also prevented me from receiving a probable cause hearing pursuant to Pennsylvania Commonwealth Court Rules, Rule 513, Requirements for Issuance; Dissemination of Arrest Warrant Information, Section (A), (B) 2 and 4. Rule 426 of the Philadelphia Municipal Court Procedure, states that the public defenders received a flat fee of $350/case. In knowing this revelation, the public defender's subtle ineffective defense provides the basis of a highly plausible conspiracy theory especially when the public defenders know the court rules. See Paragraph 46.

46. Not being provided copies of the documents, is a practice and policy that effectively leaves indigent defendants, similarly situated, helpless because the public defenders also participate in the policy and practice as evinced in my case. According to the MC transcript, I was arraigned at 16:07 (4:07 pm) on October 20, 2015. The Arrest Warrant Information was date and time stamped, at the bottom of the documents - Printed: 10/20/2015 04:12 PM, but I was not provided with copies at that time nor the first business day after.

47. On December 7, 2015, I went to the Public Defender's office, to obtain a letter that I was represented by them, and was ruled not guilty, to provide to my employer, and to also try to obtain copies of the Arrest Warrant Information, accompanied by one of the residents, Mrs. Joyce Marshall, that lives at the Philadelphian Complex, who I had become a good friend of, and who was morally supportive for my cause by visiting me, on two occasions, and attending my trial. I asked her to accompany me because I was not comfortable going to the defender's office alone. I met with Geoffrey Kilroy, and he provided me with the Not Guilty letter, but refused to provide me with copies of the Arrest Warrant Information. Geoffrey Kilroy asked me

what was I going to do with them [the documents].  I told him it didn't matter because I was entitled to them. He then told me I had to discuss it with his supervisor.  This exchange occurred while Joyce Marshall was present.  When Geoffrey Kilroy's supervisor became available, he did not want to discuss the situation standing where we were.  The supervisor wanted to go to the back.  I told him that we could talk where we were.  He insisted we go to the back.  I relented, and Joyce and I began to follow him.  He told Mrs. Marshall she couldn't accompany us.  I then stated that we [Geoffrey Kilroy and I] had just discussed the events with Mrs. Marshall present. The supervisor was adamant.  I relented, and accompanied the supervisor to the back.  We entered a small office.  It didn't look like the office of a defenders association supervisor.  The office was barren, i.e. no plaques, the desk was very small, and no view.  The supervisor sat behind a small desk, I sat in a chair close to the entrance.  He told me to close the door.  I told him we could let the door remain open.  The supervisor then ordered me to close the door, at that point I immediately exited the office, and apprised Mrs. Marshall of the events.  A person seated in the waiting area overheard our discussion,  earlier, and informed me I could get copies of the documents at the Criminal Justice Center.  After receiving that information, we departed the defender's office.  I took Mrs. Marshall back to the Philadelphian Complex, and I went back into Center City to the Criminal Justice Center.  I obtained the documents at a cost of $10.00.

48.  As I continue with the chain of events of the meetings, between Ms. Bachman and myself, around the Franklin Institute, I told Ms. Bachman, on July 27, 2015, that I was extremely nervous.  I told Ms. Bachman how I came to see her, telling her about the shuttle bus describing it, and, coincidentally, while we were talking, the bus was on it's return trip (the 5 pm trip is when the 45 minute trips begin because of the traffic), from Center City to the Philadelphian Complex, and I pointed the bus out to her as it went by (I believe Ms. Bachman departed the Franklin Institute about 525 pm on that day).  I then told Ms. Bachman that I was there because I wanted to meet her.  I told her that I couldn't see how someone as nice as you are could be single (I

said that because she didn't have an engagement or wedding ring on her ring finger. That was why and how I developed the idea to try and meet her. Had she had an engagement or wedding ring on, I would not have ever tried to gain her friendship). Ms. Bachman neither confirmed nor denied my statement that I couldn't see how someone as nice as you are could be single.

49. Ms. Bachman's statement in the investigation report states: "I told him I had a boyfriend, and I said, "Maybe we can just be friends. I will wave to you if I ever see you." (Page 2 of 6, Investigation Report).

50. Ms. Bachman is being untruthful. Ms. Bachman never told me she had a boyfriend. My first email contradicts that statement - "**All hopes are contingent on you not being involved**." (Page 1 of 2, email, Tuesday, September 29, 2015, 9:50 pm) If Ms. Bachman told me she had a boyfriend, I would not have sent the first email, nor any subsequent correspondence, and would have just acknowledged Ms. Bachman in passing if I saw her - nothing more. More importantly, the Court would not be addressing this malicious prosecution claim.

51. Ms. Bachman then told me I was "very handsome" (her exact words). I felt so good when she said that. I couldn't believe she said it. Ms. Bachman then asked me where I lived, and I told her in West Phila. Ms. Bachman then told me she had a train to catch, and she was on her way to the train station to catch the train to Radnor. **I asked her** could I walk with her, and Ms. Bachman said yes.

52. In my third email, on Wednesday, October 7, 2015, 4:40 pm, inter alia, I sent a photograph attachment, of a beautiful brick mansion, I took in Radnor. I thought since she lived in the area, she may have seen the mansion before. (I took the photograph on Sunday, September 13, 2015, 5:28 pm, the assignment was on Saturday, September 12, 2015, after my shuttle bus assignment).

53.  While we we walking towards Suburban Train Station, I was talking about my trip to see the Pittsburgh Steelers at their first day of training camp, and we talked about football. Once we arrived at the corner of 20th and Arch, we crossed Arch Street, to the South side of 20th Street at Arch, crossed 20th Street to the East side of Arch, and proceeded East on Arch. Once we arrive at 1901 Arch, the new luxury apartment building, we stopped, and I told Ms. Bachman I was going to go.  I could have walked her all the way to the train station, but I was to nervous and afraid, and as I was walking away, Ms.Bachman said, "Go Eagles", and we laughed as we went our separate ways.  In the Investigation Report, as it relates to the 7/27/2015 visit, Ms. Bachman states:  We stopped for a second, I ended the conversation and he walked off."  This statement is not true.

54.  On August 26, 2015, I stopped by and waited to see Ms. Bachman again.  During the last month, between the first meeting and this 2nd visit, we had seen each other several times a week, and we greeted each other as we past each other.  As I had done during the first meeting, I waited on the Atria side of Race Street at 20th.  When Ms. Bachman exited the building, I greeted her, and still nervous, but not as nervous as I was during the first visit, talked with her asking more questions.  Ms.  Bachman was receptive, but told me she was on way to meet friends.  I considered asking her could I accompany her, but I was just to afraid, and I had left my car windows open, and the parking spot was for only thirty minutes where I had parked. During this meeting, I asked her about the ankle brace she had been wearing several months prior.  I wanted to ask her during the first meeting, but I was to overwhelmed with joy.  Ms. Bachman told me she had plantar fasciitis.  Also, I wanted to see her face without the sunglasses close up.  During the times I saw Ms. Bachman on 20th Street, I did see her without the sunglasses, but not close up and very seldom without the sunglasses.  Seeing her close up without the sunglasses on was great.  Her beauty is amazing.  After that, I asked her again,

could I walk with her for a couple of blocks and she allowed me to. I departed from her at Arch Street, on 20th, and Ms. Bachman continued South towards Market Street.

55. On September 29, 2015, I sent the first of 5 emails ( 9/30; 10/7, 10/9, and 10/12). All of the emails were what friends may send to each other - polite and respectful.

56. On October 14, 2015, I received an email from Ms. Bachman titled Re: Cease and Desist from stalking and harassing, but I did not see it until the morning of October 15, 2015 because I did not check my email on October 14th.

57. In the email it is stated that, "This letter acts as your final warning …." I did not receive a first warning.

58. In the email, I noticed that a "Cc: Kenneth Kleinman, Esq" was referenced. It's my belief that Kenneth Kleinman was the author of the Cease and Desist letter.

59. On October 17, 2015, I used a vacation day to attended my high school reunion. It was the first one I attended, and I enjoyed it very much. I returned home on Sunday, October 18, 2015, enjoyed the day doing small chores and errands, and getting my uniform ready for work on Monday, October 19, 2015.

60. On October 19, 2015, I completed my shuttle bus assignment, and worked an extra assignment driving the Cira Center shuttle bus, on Mondays only, from 245 pm until 730 pm until the company was able to place another driver in the position.

61. During the lunch break from 315 to 345, I decided I would try to contact Kenneth Kleinman. I googled his name and was able to successfully locate him. I called the office he worked at, and he accepted the call. I introduced myself, and he knew who I was. I asked him what was going on, and told me that he didn't really know what was going to happen. He also tried to insist that I was to understand that I couldn't meet people the way I tried to meet Ms. Bachman. I told him that you can meet people in various ways, and that it was up to the other person. While we were talking, Felicia Banks, the homeowner where I resided, was calling me.

I ended the call with Kenneth Kleinman, and answered the call with Felicia. Felicia told me the police had just left the house looking for me saying that I stalked someone, and wanted to look in my room. I told her I would call her back, and ended the call with her, and contacted Kenneth Kleinman again. He accepted the call, and I told him the police just left my home. I asked him why are they doing this, and he told me that I couldn't meet people the way I met Ms. Bachman. I respectfully disagreed, and after a couple of minutes we concluded the call.

62. I then drove the 345 and the 415 trips, and when I returned at 445, the assistant dispatcher was waiting for me. I knew why he was there. I asked him were they [the police] waiting for me. He didn't confirm or deny, and was looking very sad. I told him I knew.

63. I arrived at the headquarters, parked the company vehicle the assistant dispatcher had driven to meet me, and walked towards the office. The parking lot where the employees park is before you get to the building. I saw a black SUV by the employee's entrance pointing in my direction, towards the parking lot, and as I approached my car, Men in plain clothes exited the vehicle and walked towards me. At that point I can't recall what was said, but I asked could I put my wallet and cell phone in my truck, and was permitted to do so. I was then handcuffed, and a marked police car arrived. I was placed in the police vehicle, and transported to the Philadelphia Special Victims Unit. I was placed in a cell and sat there for approximately 9 to 10 hours, and was not interviewed, ask how I was doing, did I need to use the rest room - nothing. In the very early am, I was taken by police vehicle, to the central location at 8th and Race. Once there, I was in-processed, and placed in a cell with another person. Approximately, 8 hours later I was video arraigned. Several hours later, I was taken to Philadelphia County Jail where I remained until December 3, 2015.

## V. CLAIMS

### COUNT I - MALICIOUS PROSECUTION UNDER 42 U.S.C. SECTION 1983

*PLAINTIFF VS DEFENDANT DET OWENS AND ADA ERIN OBRIEN*

64. Mr. Banks herby incorporates all other paragraphs of this complaint as if fully set forth herein. 42 U.S.C. Section 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation,
> custom or usage of any state or territory or District of Columbia subjects
> or causes to be subjected any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges
> or immunities secured by the constitution and law shall be liable to the
> party injured in an action at law, suit in equity, or other appropriate
> proceeding for redress …

65. Mr. Banks is a citizen of the United States and Defendants in this count are persons as pursuant to 42 U.S.C. Section 1983 and acted under color of state law.

66. To recover under section 1983 for malicious prosecution, plaintiff must show that (1) defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) defendant acted maliciously or for a purpose other than bringing plaintiff to justice, and (5) plaintiff suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of a legal proceeding.

67. Det Owens initiated the criminal proceeding. The decision to pursue the prosecution was Det Owens not ADA Erin O'Brien's or ADA Allison Borgatti,'s or ADA Erika Wevodau's. In addition, Det Owens failed to disclose exculpatory evidence that he knew or should have known when he did not reveal my bus route and how it travelled North and South on 20th Street between the Parkway and Market Streets with great frequency, and on Spruce Street every evening. Det Owens failed to obtain the surveillance footage from the surrounding agencies that would have demonstrated that Ms. Bachman was being untruthful, and shown that each time we met, it was on 20th Street around the front of the Franklin Institute. Def Owens made false and

misleading reports in his Investigation report when he stated I had 3 out of county arrest for Megan's Law which inappropriately was used to make my bail exorbitant at 500 thousand dollars for a "ROR" charge in violation of my Eighth Amendment Right against excessive bail and cruel and usual punishment (which would have also supported fourth Amendment claims, of false arrest and false imprisonment, but I believe those claims are time barred).

68.  Plaintiff was found Not Guilty by Magistrate Judge Meehan, Jr.

69.  Det Owens initiated the proceeding without probable cause for harassment under 18 Pa CSA 2709 (a)(4), when not one of the emails contained any communication that could be construed as lewd, lascivious, threatening, obscene words, language, drawings, or caricatures with the intent to harass, annoy, or alarm another.  All of the emails were respectful and polite.

70..  Det Owens initiated the proceeding without probable cause for stalking under 18 Pa CSA 2709.1 (1), when not one of the 3 visits to see Ms. Bachman was with the intent to place her in reasonable fear of bodily injury, or to cause her substantial emotional distress.

71.  Det Owens failed to take the time to devote to an adequate preliminary investigation when no immediate action was called for.

72.  As a public servant, Det Owens was required to perform his job without regard for financial conflict of interest or political affiliation.  As a public servant he is required to give all members of the public equal consideration, and no one member of the public gets extra favor or less service than the other ( See City of Philadelphia, Integrity Works for Everyone).

73.  When Det  failed to interview me, he failed to provide me with equal consideration. Def Owens interviewed Ms. Bachman why not interview me.  When you have to register as a sex offender, you have to provide the Pennsylvania State Police with all of your contact and identifying information, i.e. name, address, telephone number, cell phone number, car registration, work location, and school location.  As a Philadelphia Police Detective, Det Owens has access to this information, and could have contacted me, to arrange an interview to clear up

any misunderstandings, but instead acted maliciously an pursued Ms. Bachman's interest when

she stated: Q. What do you want to see happen in this case?

> R. I just want whatever you think is best to happen. I want him to leave me alone
>
> and I want to be safe. **It would be great if he had a different bus route**.
>
> (Investigation Report, Page 4 of 6).

### COUNT II. CIVIL AND CRIMINAL CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. SECTION 1983
*PLAINTIFF V DEFENDANTS DET OWENS, KENNETH KLEINMAN, RICHARD RABENA, ADA ERIN O'BRIEN, ADA ALLISON BORGATTI, AND ADA ERIKA WEVODAU*

74. Mr. Banks herby incorporates all other paragraphs of this Complaint as if fully set forth

herein.

75. Go to Paragraph's 26 and 27 for a detailed averment.

76. It is Mr. Banks' contention that all of the individual Defendants agreed and understood

that they would, plot, plan, conspire or act in concert, with respect to the deprivation of Plaintiff's

Constitutional rights, by fabricating evidence, initiating false criminal charges, misrepresenting

the case to the Magistrate Judge, or just coordinating their efforts for a common objective.


### PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiff respectfully request the following:

a. Enter a declamatory judgement that the Defendants violated Plaintiff's fourth

Amendment right to be free from unreasonable seizure and malicious prosecution;

b. Award compensatory damages against all Defendants, jointly and severally, in an

amount to be determined at trial;

c. Award punitive damages against Defendants Det Owens, Kenneth Kleinman, Richard

Rabena, The Franklin Institute, and Erin O' Brien;

d. Enter an award for costs, expenses, and counsel fees pursuant to 42 U.S.C. Section 1988; and

e. Enter such other relief as this Honorable Court may deem just and deserving.

Plaintiff hereby respectfully demands a jury trial.

December 4, 2017

Respectfully submitted,

JONATHAN K. BANKS

6051 WEBSTER STREET
PHILADELPHIA, PA 19143

TEL: 267-575-2441
jkbanks48@comcast.net